## STATE OF CONNECTICUT *v.* RICHARD LAMME
## (13792)

PETERS, C. J., SHEA, GLASS, HULL and BORDEN, Js.

Argued May 31—decision released August 7, 1990

*James J. Ruane,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief state's attorney, and *Donald A. Browne,* state's attorney, for the appellee (state).

PETERS, C. J. The sole issue in this appeal is whether the provisions of article first, § 9,[1] of the Connecticut constitution preclude the police from detaining a person for limited investigative purposes without having probable cause to arrest. The state charged the defendant, Richard Lamme, with the operation of a motor vehicle while under the influence of intoxicating liquor and with the operation of a motor vehicle while his license was under suspension, in violation of General

---

[1] Article first, § 9 of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

Statutes §§ 14-227a (a) and 14-215 (a), respectively.[2] The defendant unsuccessfully moved, prior to trial, for the suppression of evidence concerning his performance of field sobriety tests. The trial court rendered judgment against the defendant on a jury verdict finding him guilty as charged, and the Appellate Court affirmed that judgment in *State* v. *Lamme,* 19 Conn. App. 594, 563 A.2d 1372 (1989). This court granted certification to consider the merits of his novel state constitutional claim, and we now affirm.[3]

_____

[2] "[General Statutes] § 14-227a. OPERATION WHILE UNDER THE INFLUENCE OF LIQUOR OR DRUG OR WHILE IMPAIRED BY LIQUOR. (a) OPERATION WHILE UNDER THE INFLUENCE. No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight."

"[General Statutes] § 14-215. OPERATION WHILE REGISTRATION OR LICENSE IS REFUSED, SUSPENDED OR REVOKED. (a) No person to whom an operator's license has been refused, or whose operator's license or right to operate a motor vehicle in this state has been suspended or revoked, shall operate any motor vehicle during the period of such refusal, suspension or revocation. No person shall operate or cause to be operated any motor vehicle, the registration of which has been refused, suspended or revoked, or any motor vehicle, the right to operate which has been suspended or revoked."

[3] In the defendant's appeal to the Appellate Court, he unsuccessfully advanced three grounds for overturning his conviction. In addition to his challenge, under both the federal and the state constitutions, to the admissibility of evidence of his performance on two roadside sobriety tests, he contested the admissibility of opinion evidence offered by two police officers and the propriety of the trial court's instructions on reasonable doubt.

Our order on the defendant's petition for certification to appeal; *State* v. *Lamme,* 212 Conn. 820, 565 A.2d 541 (1989); granted the petition only with respect to the state constitutional law aspect of his claim concerning the admissibility of field sobriety tests. The question we certified is: "What

The opinion of the Appellate Court reports the relevant facts. During the evening of October 22, 1987, the defendant consumed several alcoholic beverages at the bar of the Trumbull Marriott hotel. At the request of the hotel management, in the early hours of the following day, police officer Richard Applebaum of the Trumbull police department wakened the defendant who was asleep in a chair in the front lobby. *State* v. *Lamme,* supra, 595. Noticing a strong odor of alcohol on the defendant's breath, Applebaum offered to arrange a safe ride home for the defendant. Id. The defendant responded, however, that he would wait in his car for a friend to drive him home. Id., 595–96. Having watched the defendant walk to his car with an uncertain gait, Applebaum radioed police headquarters with a description of the defendant and his car. Id., 596.

Police Officer Thomas Savarese heard the police broadcast and drove down a public road in the vicinity of the Marriott, where he observed the defendant driving a car that matched the broadcast description and did not have its headlights illuminated. Because the failure to display lighted headlights while on a public highway at night is an infraction; see General Statutes § 14-96a (d);[4] Savarese stopped the defendant's car. Id. Savarese too noticed a strong odor of alcohol on the defendant's breath and then asked the defendant to step out of his car to take roadside sobriety tests of his physical dexterity.[5] Id. The defendant's failure to

standard governs the determination of whether the detention of a criminal defendant is 'clearly warranted' under article first, § 9, of the Connecticut constitution?"

[4] "[General Statutes] Sec. 14-96a. LIGHTED LAMPS AND ILLUMINATING DEVICES REQUIRED, WHEN. . . .

"(d) Failure to provide lighted lamps and illuminating devices at such time as required by this section shall be an infraction."

[5] The defendant was asked to perform two sobriety tests: to walk heel to toe in a straight line and to touch his index finger to the tip of his nose with his eyes closed.

pass these tests was the basis for his arrest for driving while under the influence of intoxicating liquor. Id. After the defendant's arrest, Savarese took him to police headquarters. Id.

On these facts, the trial court and the Appellate Court concluded that the defendant was not entitled to suppress evidence concerning his performance on the field sobriety tests. Both courts agreed that the police had legally stopped the defendant, in the first instance, for driving without illuminated headlights in the dark of night. Id., 599. Thereafter, the odor of alcohol on the defendant's breath furnished a reasonable and articulable suspicion that the defendant might be involved in criminal activity and justified his further detention for the limited intrusion represented by sobriety testing at the place where he was being detained. As a matter of federal constitutional law under the fourth and fourteenth amendments to the United States constitution, the police made a valid *Terry* stop, as such a detention has been defined in *Terry* v. *Ohio,* 392 U.S. 1, 20–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and subsequent cases. See, e.g., *United States* v. *Hensley,* 469 U.S. 221, 227, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985); *Florida* v. *Royer,* 460 U.S. 491, 499–500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State* v. *Aillon,* 202 Conn. 385, 398–402, 521 A.2d 555 (1987); *State* v. *Carter,* 189 Conn. 611, 617–18, 458 A.2d 369 (1983).

In the present appeal, the defendant urges us to hold that our state constitution requires a different result by virtue of article first, § 9, which provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." The defendant maintains that this section forbids the police to detain any person, even on reasonable and articulable suspicion, unless and until the police have probable cause to make an arrest. Applied to the facts of this case, the defendant's theory would require exclusion of the

results of his roadside sobriety tests because the police concededly did not have probable cause to arrest him for driving while under the influence until he failed to pass these tests. We are unpersuaded.

The defendant's constitutional claim focuses on the phrase "except in cases clearly warranted by law." Although this court has not specifically addressed the import of this language in the context of an investigative detention short of an arrest, we have generally characterized article first, § 9, as one of our state constitutional provisions guaranteeing due process of law. See, e.g., *State* v. *Marra,* 195 Conn. 421, 425, 489 A.2d 350 (1985); *State* v. *Castonguay,* 194 Conn. 416, 420, 481 A.2d 56 (1984); *Parks* v. *Bourbeau,* 193 Conn. 270, 278 n.8, 477 A.2d 636 (1984).[6] A due process perspective therefore informs our assessment of the defendant's contention that, because warrants cannot be issued without a showing of probable cause, the phrase "clearly warranted by law" mandates a universal probable cause standard whenever the police restrain personal freedom to any degree.

In examining the text of article first, § 9, to determine the extent to which it supports the defendant's claim, "we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. *Cahill* v. *Leopold,* 141 Conn. 1, 19, 103 A.2d 818 [1954]; 1 Cooley, Constitutional Limitations (8th Ed.) p. 125. Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution." *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978),

---

[6] By contrast, article first, § 7, of the Connecticut constitution provides constitutional protection from unwarranted searches and seizures. The scope of § 7 is not currently before us in light of the question that we certified. The Appellate Court, however, rejected the defendant's claim under § 7. *State* v. *Lamme,* 19 Conn. App. 594, 600–601, 563 A.2d 1372 (1989).

appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454
U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). In
article first, § 9, the "except in cases clearly warranted
by law" clause modifies, without apparent distinction,
the rights of a person "arrested, detained or punished."
Although the validity of an arrest turns on proof of
probable cause, that standard of proof has no bearing
on the legality of punishment. Accordingly, on its face,
§ 9 does not impose a universal probable cause stan-
dard in all the circumstances that the section encom-
passes. Furthermore, § 9's separate inclusion of arrests
and detentions counsels against finding an intent to
impose a constitutional requirement for a parity of
treatment between the greater intrusion on personal
freedom represented by an arrest and the lesser intru-
sion represented by a detention. Read in its entirety,
the text indicates that the specific content appropri-
ately to be assigned to the phrase "clearly warranted
by law" depends on the particular liberty interest that
is at stake. Such a construction is, of course, entirely
consonant with the general contours of a constitutional
safeguard rooted in flexible principles of due process.
See, e.g., *Asherman* v. *Meachum,* 213 Conn. 38, 46,
49–53, 566 A.2d 663 (1989); *Mathews* v. *Eldridge,* 424
U.S. 319, 324–25, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976);
*Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593,
33 L. Ed. 2d 484 (1972).

The historical antecedents of article first, § 9, shed
little light on the scope of the section's mandate with
regard to detentions. The precise language of the
present section was originally adopted as article first,
§ 10, of the Connecticut constitution of 1818.[7] Prior to
1818, Connecticut's declaration of rights took the form
of a statutory enactment dating back to the preamble
to Ludlow's Code of 1650. That preamble provided that

---

[7] The present enumeration results from the 1965 constitution's incorpo-
ration of the former article first, § 4, into article seventh.

"no mans life shall bee taken away . . . no mans person shall bee arrested, restrained, banished, dismembered nor any way punished . . . under colour of Law or countenance of Authority, unless it bee by the vertue or equity of some express Law of the Country warranting the same, established by a General Courte, and sufficiently published, or in case of the defect of a Law in any perticular case, by the word of God." 1 Public Records of the Colony of Connecticut 509 (J.H. Trumbull Ed. 1850). This text survived with only minor changes until its last codification before the adoption of the constitution, in the 1808 Public Statute Laws of Connecticut. At that time, the final clause of the preamble read: "unless clearly warranted by the laws of this state." Public Statute Laws of the State of Connecticut (1808), Title I, § 2.

For present purposes, the most significant aspect of the pre-1818 declaration of rights is that it had constitutional overtones even though it was statutory in form. "The Declaration and supplementary statutes relating to individual rights were grounded in the Connecticut common law and viewed as inviolate. Abridgements perpetrated by the government were considered void on their face and courts were to refuse to enforce them." C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94 (1982); see also H. Cohn & W. Horton, Connecticut's Four Constitutions (1989) p. 18. The historical roots of "except in cases clearly warranted by law" appear therefore to provide protection for personal freedom through a blend of statutory and constitutional rights that, like the text of the current article first, § 9, incorporates no single constitutional standard.

The Connecticut constitutional convention of 1818 enacted a constitutional declaration of rights as an integral part of its major agenda of replacing a

parliamentary form of government based on legislative hegemony with a system of government embodying a division of power among three distinct departments: legislative, executive and judicial. The adoption of a written declaration of rights reflected an important change in political attitudes. "[T]he old pre-Revolutionary leaders thought that republican government with legislative supremacy was the best safeguard of personal liberties. . . . By . . . 1818, the beliefs of the old revolutionaries were replaced by the thinking of the post-Revolutionary generation, who perceived the necessity of written guarantees . . . [for the protection of personal rights that might not] be safe with the legislature and the courts . . . ." C. Collier, supra, 98. The history of the convention, officially reported in the Journal of the Proceedings of the Convention of Delegates (1873), does not, however, reveal why, in formulating the new declaration of rights, the drafters elected to modify the terms of its statutory antecedent by replacing "restrained" with "detained" and by replacing "clearly warranted by the laws of this state" with "clearly warranted by law."

This constitutional history demonstrates an underlying concern for protection of personal freedom that does not readily translate into constitutional doubt about the legality of brief investigative detentions. The available case law, in the period immediately antedating the adoption of the constitution of 1818, suggests that the official investigation of potentially criminal behavior was not then viewed as constitutionally suspect. See, e.g., *Wrexford* v. *Smith*, 2 Root 171 (1795); *Knot* v. *Gay*, 1 Root 66, 67 (1774); and see 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) 390–91. The only case decided reasonably contemporaneously with the adoption of the 1818 constitution followed the pre-constitutional pattern of construing "warranted by law" as having a statutory

referent similar to that expressly contained in the pre-1818 statutory declaration of rights. In that case, *Jackson* v. *Bulloch,* 12 Conn. 38, 43 (1837), this court noted the "solicitude for personal liberty manifested in the constitution," but attached no specific constitutional consequences to that constitutional solicitude. Faced with a petition for a writ of habeas corpus seeking the release of a slave brought to this state by her Georgia owner, the court framed the issue as "what was the state of our law upon this subject, at the time of the adoption of the constitution of this state: for it has not since been varied." Id. The court resolved that issue, in favor of freedom, under the relevant "state of our law" as found in the provisions of pre-1818 statutes for the abolition of slavery in Connecticut. While the statutory resolution of the issue posed to the court may well have obviated the need to articulate a constitutional standard, *Jackson* v. *Bulloch's* framing of a constitutional issue in statutory terms indicates that detentions under article first, § 9, near the time of its adoption, were not perceived as invoking special constitutional considerations apart from applicable statutory constraints.

In this century, the case law under article first, § 9, continued to emphasize the central role of statutory safeguards in implementing the constitutional right of personal liberty. In *State* v. *Carroll,* 131 Conn. 224, 227–29, 38 A.2d 798 (1944), this court held that a police officer could be charged with manslaughter for having used physical force to consummate a warrantless arrest under circumstances unauthorized by the applicable statute. Despite the broader reach of common law authority to arrest, and despite the reasonableness of the officer's suspicions, this court characterized the officer's attack on his victim as "a gross violation of his fundamental rights," citing the text of article first, § 9. Id., 231; see footnote 7, supra. The basis for the con-

stitutional violation was, however, the mandate of the statute: "[T]he purpose of the close restriction upon arrests without warrants is to protect the liberty of the innocent. We cannot say that the legislature adopted a wrong policy when it weighed that liberty against the possibility that some guilty person might escape." *State* v. *Carroll,* supra; see also *Sims* v. *Smith,* 115 Conn. 279, 281–83, 161 A. 239 (1932).

Only in *State* v. *Federici,* 179 Conn. 46, 425 A.2d 916 (1979), has this court assigned independent substantive significance to article first, § 9. *Federici,* like *State* v. *Carroll,* dealt with the consequences of an arrest that, lacking probable cause, was illegal under the relevant statute; General Statutes § 54-1f; and article first, §§ 7, 8 and 9, of the Connecticut constitution. We concluded, in *State* v. *Federici,* supra, 61–62, that when an arrest is tainted by its linkage to an unconstitutional search and seizure, the use of such illegally obtained evidence in a subsequent prosecution compromises the right to a fair trial and requires dismissal of the outstanding charges related thereto. See also *State* v. *Fleming,* 198 Conn. 255, 261–62, 502 A.2d 886 (1986).

*Federici* also addressed the validity of a detention short of an arrest. Because the defendant in that case had conceded the constitutionality of his initial detention; *State* v. *Federici,* supra, 51; we relied on *Terry* v. *Ohio,* supra, as well as article first, §§ 7, 8 and 9, to conclude that reasonably articulated suspicions justified the police in stopping the defendant's car and in detaining him for routine questions and observations. *State* v. *Federici,* supra, 57. We held, further, that this justifiable stop, based on a police broadcast of the description of an escape vehicle and the lack of a displayed rear marker plate on the defendant's car, permitted the police to "view" the contents of the car. Id. At the least, *Federici* suggests that this court did not

then perceive any fundamental inconsistency between the legality of a detention under our state constitution and the principles of *Terry* v. *Ohio.*

In sum, the few available precedents, like the text of article first, § 9, counsel against the conclusion that only a detention supported by a showing of probable cause is "clearly warranted." We have, however, never addressed this issue head on, and now must consider whether sound constitutional policy requires us to adopt a different view. "The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes,* 209 Conn. 98, 115, 547 A.2d 10 (1988). In searching for an appropriate contemporary interpretation of our constitution, furthermore, we may look to, but are not bound by, relevant precedents in the federal courts. "We have frequently relied upon decisions of the United States Supreme Court interpreting . . . the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." *State* v. *Marsala,* 216 Conn. 150, 159–60, 579 A.2d 58 (1990); *State* v. *Dukes,* supra, 112; *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Jarzbek,* 204 Conn. 683, 707–708, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); *State* v. *Kimbro,* 197 Conn. 219, 234–35, 496 A.2d 498 (1985); *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

Our appraisal of the due process contours of article first, § 9, leads us to conclude that the principles of fundamental fairness that are the hallmark of due process permit a brief investigatory detention, even in the absence of probable cause, if the police have a reasonable and articulable suspicion that a person has committed or is about to commit a crime. We hold, therefore, that the principles underlying constitutionally permissible *Terry* stops, as further construed in cases such as *United States* v. *Hensley,* supra, 227, and *Florida* v. *Royer,* supra, 498, define when detentions are "clearly warranted by law" under article first, § 9. Balancing the circumscribed nature of a *Terry* stop intrusion against the serious risks of criminal behavior, especially in the context of the risks associated with driving while under the influence of intoxicating liquor,[8] we are persuaded that the defendant's brief detention did not violate his due process rights.

The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution. We have previously held that "the warnings enunciated by *Miranda* v. *Arizona,* [384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] . . . are independently required under the due process clause of article first, § 8, of the Connecticut constitution." *State* v. *Barrett,* 205 Conn. 437, 447, 534 A.2d 219 (1987), and cases therein cited. We have likewise concluded that a claimed right to hybrid representation, unavailable under the sixth amendment to the United States constitution, is equally unavailable, despite some textual distinctions, under article first, § 8. *State* v. *Gethers,* 197 Conn. 369, 382–88, 497 A.2d 408 (1985).

---

[8] We note that the timely intervention of the police in this case may well have saved the defendant from facing much more serious charges, as well as possible injury to himself.

Our decision to interpret article first, § 9, in light of *Terry* v. *Ohio* finds further support in the universal acceptance of its governing principles in state constitutional law cases around the country. See, e.g., *State* v. *Kennedy*, 107 Wash. 2d 1, 4, 726 P.2d 445 (1986).

In conclusion, the text, the history, and the policy embodied in article first, § 9, all rebut the position of the defendant that an investigatory detention without probable cause cannot pass constitutional muster.[9] The defendant's conviction must stand.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[9] In light of the difficulties that attend research into state constitutional law, we commend both counsel for their highly professional and wide ranging briefs in this case.