[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] FACTS 
The Defendant was arrested by the Middletown Police Department on December 15, 1999 at approximately 10:20 P.M. for Operating Under the Influence in violation of C.G.S. 14-227a. At the suppression hearing held on September 13, 2000. the State and the Defendant stipulated to the introduction of a 911 tape and the police report of Officer Inglis who was the arresting officer. On November 17, 2000, a Supplemental Stipulation of Facts was filed to include the Alcohol Influence Report, commonly called an for the court's consideration. No testimony was taken at the hearing. Officer Inglis was not involved in the actual stop of the defendant's automobile. As noted in Officer Inglis's report (State's exhibit #1) Officer Kerkes stopped the defendant's automobile based on a dispatch of a motorist's call concerning the vehicle in question. Both parties stipulated that Officer Kerkes had no recollection of his initial stop of the defendant's vehicle or any relevant acts concerning this case. Officer Inglis arrived after the stop of the defendant's vehicle and took over the investigation because Officer Kerkes was "going off shift." There is no dispute that the defendant's automobile was stopped by Officer Kerkes based on a dispatch concerning the contents of an anonymous call as detailed in the 911 tape. (State's exhibit #2.) The caller's information was specific as to the car's location, description and plate number. There is also no dispute that there exists no evidence that Officer Kerkes observed any type of erratic or unlawful driving by the defendant prior to the stop. The stop of the defendant's car led to his arrest for Operating Under the Influence based on an odor of alcohol, the observation of alcohol in the vehicle, admissions concerning drinking at Foxwoods Casino, and his failing the field sobriety tests. After his arrest the defendant consented to breath tests which showed a blood alcohol content of .186 and .168 percent.
The 911 tape contains a conversation between a dispatcher and an apparent anonymous concerned citizen that lasts almost five minutes. During the recording, the caller describes in detail the erratic driving of the defendant's automobile while the caller remains a safe distance behind. The caller names to the dispatcher the stores he is passing on Route 66 in Portland as he follows the automobile. He gives a description CT Page 16379 and plate number of the vehicle. The anonymous caller gives a play-by-play description of every erratic and dangerous move the vehicle makes on the road. The caller eventually turns off the main road indicating to the police that the suspect vehicle is going over the Arrigoni Bridge from Portland to Middletown. The defendant's car was stopped on the Middletown side of the Arrigoni Bridge.
The defendant has moved to suppress any and all written statements, the results of field sobriety testing. and the results of the chemical analysis of his breath claiming that the stop was not based on reasonable suspicion.
Since the length and content of the 911 tape are extremely important to a resolution of the issue concerning the adequacy of the stop, the following is an accurate transcription of the tape which was furnished in the State's memorandum:
Dispatcher: 911
Caller: Yes, I'm on Route 66 in Portland.
D: Yes, sir.
 C: I have a guy or someone in front of me who is soooo bombed it looks like . . . they're all over the road.
D: Whereabouts in Portland are you sir?
 C: I'm going right by the Christmas Tree Shop over here.
D: Christmas Tree Shop there?
 C: Going toward the Dunkin Donuts, Route 17. They're in a white Taurus station wagon. You want the license plate number?
D: Yes sir.
 C: VS-fifty one ninety, almost just hit the guardrail just now.
D: VS-fifty one ninety?
C: V like Victor, S like Sam, five one nine oh. CT Page 16380
D: Hold on.
C: Yep. He's all over the place.
D: (Inaudible . . .) Where's he going now?
 C: He's still straight. It's (inaudible) where got to the two lanes, where the Texaco gas station is. He just hammered his brakes. He's hitting his brakes right now in the middle of the road cause he doesn't know where he is.
D: OK.
 C: I'm on the side; I'm trying to stay behind him so I don't get too close.
D: Sure. Sure. Don't get too close.
 C: But I just figured I'd let you . . . I mean he is sooo
far all over the road. He almost went off the embankment on 66.
D: OK. What's his location now?
C: He is, just before you get to the Dunkin Donuts.
 D: (Said to someone else): Just before Dunkin Donuts. So. he's heading towards Portland?
C: Yeah, he didn't get the light yet. The light's red.
 D: (Said to someone else): In Portland, just before Dunkin Donuts.
 C: Now he just sped up at a red light. Just so you know.
D: What's that sir?
 C: He just sped up at a red light, like he just gunned it about 50 mph going at a red light and he's almost going to hit . . . and he's gonna hit it . . . hold on, he almost the, he almost hit the pole.
CT Page 16381
 D: He almost hit a pole?
 C: Right in front of the Dunkin Donuts. He's going right at the . . . sign right now.
D: (Inaudible) Near Dairy Queen?
 C: Yeah, he is, he is wayyy out of, he just flipped from the right lane to the left lane just now.
D: OK.
 C: Just so you . . . He's right by Henkels and McCoy right now.
D: He's going where?
 C: Past Henkels and McCoy, before you get to Russo's pizza.
D: (Speaking to someone else) Russo's pizza.
C: He's right there now.
 D: (Speaking to someone else): '93 Mercury Sable. station wagon, color white.
 C: Color. . . ahhmm . . . he's right in front of. he's right in front Russo's right now. Unidentified Voice: He's all over the road.
 C: Ahh, this guy is; I haven't seen anybody swerve like this but this guy is bad. Now he's going almost 30 mph an hour now; he's like speeding up and going back and forth . . . We're just about getting to the ah light, when you get to tri-town.
 D: (Speaking to someone else): Just coming up the light at Tri-Town.
C: Now he's wayyy over in the emergency lane.
D: He's in the emergency breakdown lane now?
 C: Yeah. Now he's half in the breakdown lane, half not in the breakdown lane.
CT Page 16382
 D: He may make it to the bridge before Portland arrives because Portland right now is on a fire, but we have it.
C: He's hammering the brakes at a green light.
D: (Laughter)
 C: OK, he's got a green light; he just hammered the brakes down to 20 mph almost . . .
D: He probably needs . . .
 C: Now he's going in the left lane. I think it's a kid, actually, I'm not sure. It's two people in the car, but I couldn't tellya.
D: It's two people in the car?
C: Yep. Two people.
D: You say it may be . . .
 C: Whoa, he just almost took out a mailbox. Now he's in the left lane from the right lane. Holy Christ.
D: What are you driving, sir?
 C: I'm driving a red Prelude. And the guy behind me is staying behind me as far as you can.
D: Sure. You're in a red Prelude?
 C: Yep. Yeah. Now, I'm getting ready to turn off right now. And he's almost at the light, to go over the bridge.
D: Almost at the light to go over the bridge?
C: Yep. And I'm turning the opposite way.
 D: You're going the opposite way, so you're going to back off?
 C: Yep. He's gonna go over the bridge it looks like. CT Page 16383 But I'll let you know which way he goes.
 D: OK, great. I'll have Middletown waiting on the other end if he goes over the Portland Bridge.
 C: I'll tell you right now if he makes it over that bridge it's gonna be a miracle. Seriously, because this guy is sooo bad. I . . . I . . . It's ridiculous. Well there's a car at the light and he ain't hit his brakes yet, so. I'll let you know.
D: OK.
 C: It looks like he is going to nail him, hold on. He is. He just is gonna hit this guy.
D: He's gonna hit him?
 C: It looks like it. Oh, no, he just missed him. Ho . . . he almost went right through the light; he almost nailed the guy.
D: I know you got to cut off, but what is your name?
C: Ahhhh. Is it OK if I don't give you my name?
 D: (Speaking to someone else): He doesn't want to give it.
C: I don't want to get involved in that.
D: OK.
 C: I just figured I'd be a good Samaritan (laughter) cause my uncle's a cop.
D: Your uncle is a Middletown cop?
C: No. he's a Waterbury cop.
D: OK (laughter).
 C: Yeah, I don't know if it's, if it's. I'm turning off right now.
D: Is he turning towards the bridge? CT Page 16384
C: Yeah, turning toward the bridge.
D: He's going over the bridge.
C: Yep.
 D: (Speaking to someone else): He's coming over our way.
C: Yeah, he's coming over the bridge.
 D: OK. We'll have Middletown wait for him on the other side.
C: OK
D: OK. Thank you for your help, sir.
C: OK. No problem.
D: OK.
C: Thanks. Bye bye.
D: Bye.
 QUESTION PRESENTED 
Was the corroborated anonymous tip adequate to establish a reasonable articulable suspicion to stop the defendant's motor vehicle although no erratic operation was observed by the police?
 DISCUSSION 
Under the Fourth Amendment of the United States Constitution
and Article first, Secs. 7 and 9 of our state constitution, police may in appropriate circumstances and in an appropriate manner detain an individual for investigative purposes when there is no probable cause to make an arrest as long as there exists an articulable reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 92 U.S. 1 (1968);State v. Lamme, 216 Conn. 172 (1990). The officer's decision must be based on more than a mere hunch or CT Page 16385 speculation. In determining whether the police have the requisite reasonable suspicion, courts look at the totality of the circumstances surrounding the police action. State v. Harrison, 30 Conn. App. 108 (1993).
In this case, the stop is based on the anonymous tip plus the police corroboration of that tip. In Alabama v.White, 496 U.S. 325 (1990), the U.S. Supreme Court upheld the stop of a motor vehicle based on a corroborated anonymous telephone tip. The caller indicated that a woman would be leaving a particular apartment at a certain time and driving a described motor vehicle to a named motel. The caller indicated that the female would be in possession of cocaine. When the police went to the location, they observed a woman leave the apartment, enter the described car and drive towards the motel. The court upheld the stop of the automobile because the detailed anonymous tip predicted futurebehavior which was all corroborated by the police. Since the caller had the ability to predict future behavior, it demonstrated insider information and therefore a greater indicia of reliability. See also State v.Torres, 230 Conn. 372 (1994).
Since White, courts have struggled with how detailed anonymous tips must be to justify a seizure by police. Approximately ten years later, in Florida v J.L.,120 S.Ct. 1375 (2000), the U.S. Supreme Court found inadequate a tip that a young black male was standing at a particular bus stop wearing a plaid shirt and carrying a gun. When the police arrived at the bus stop, they observed three young black males with one wearing a plaid shirt. No suspicious conduct was observed by the police. A frisk of the defendant in that case led to the discovery of a gun. Contrary to White, the caller did not provide any predictive information. Florida prosecutors argued that there was enough corroboration because the defendant was wearing the plaid shirt as indicated by the caller. However, the Court found that all this does is identify the person referred to in the call. There was no indication that the tipster had any knowledge of concealed criminal activity, nor did the caller indicate how he obtained his information.
In State v. Bolanos, 58 Conn. App. 365 (2000), our Appellate Court, without mentioning either White or CT Page 16386J.L., held that an officer had reasonable suspicion to stop an automobile based on an anonymous call from an employee of a nightclub without any observations of erratic driving. The caller indicated that an intoxicated person had left the club Flashbacks and was driving a particular make, model and color automobile. Before stopping the car, the officer did not notice any erratic operation. The stop led to an arrest for operating under the influence. The court held that the stop was proper because 1) the caller's identity was ascertainable because he was an employee of a named nightclub; 2) since the caller worked at a nightclub. it was reasonable to infer he knew when someone was under the influence; and 3) the officer corroborated the information as to the make, model, color and direction the car was traveling.
In the present case, although the caller's identity was not ascertainable as in Bolanos, the following factors do exist:
 1) the detailed nature and content of the anonymous information;
2) first-hand observations by the caller;
3)the 911 tape; and
 4) police corroboration as to the make, color, plate number and direction the car was traveling.
In Bolanos the identity of the caller was ascertainable because he identified himself as an employee of the nightclub, however he never described his basis for believing the person was intoxicated over the phone. Here the caller is clearly relaying his first hand observations as events are unfolding before him. As previously noted, the call lasts almost five minutes as the caller describes every erratic move of the defendant's car. The caller informs the dispatcher of the exact location as he identifies numerous stores they are passing. He follows the defendant right up to the Arrigoni Bridge where the dispatcher informs the caller that Middletown Police will be waiting on the other side. The defendant is stopped on the other side of the bridge — his car matching the exact description, including the license plate. See Statev. Anderson, 24 Conn. App. 438 (1991).
In none of the preceding cases was a tape recording of the anonymous CT Page 16387 call introduced as evidence at the hearing as in the case at hand. The U.S. Supreme Court noted in Florida v. J.L., supra, at page 259, "So far as the record reveals, there is no audio recording of the tip; and nothing is known about the informant." Justice Kennedy stated in his concurring opinion at page 263:
 On this record, then, the Court is correct in holding that the telephone tip did not justify the arresting officer's immediate stop and frisk of respondent. There was testimony that an anonymous tip came in by a telephone call and nothing more. The record does not show whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number. The prosecution recounted just the tip itself and the later verification of the presence of the three young men in the circumstances the Court describes . . . Nor do we know whether the dispatcher or arresting officer had any objective reason to believe that this tip had some particular indicia of reliability.
The excited manner in which the caller describes what he is observing is also relevant when deciding reliability. In State v. Hammond,60 Conn. App. 321 (2000), the court reasoned that the tonal state of the caller added to the reliability of the anonymous call. There did not exist a recording as in this case, but the officer had testified that the informant seemed agitated and excited. The officer believed that the caller was offended that drug transactions allegedly were taking place on the steps of a church. Hammond, p. 328.
 CONCLUSION 
Many anonymous tips may fall short of the necessary articulable reasonable suspicion to justify a stop pursuant to our state and federal constitutions. However, this court holds that the detailed recorded anonymous call in this case to the dispatcher established reasonable suspicion to stop the defendant's automobile. After listening to this tape which provides a chilling play-by-play of an accident waiting to happen, this court holds that the police would have been totally remiss if they had not stopped the defendant's car even though they did not observe any evidence of erratic driving to corroborate the criminal aspects of the call.
As the court stated in Bolanos, at page 370:
 We must also note the state's pervasive interest in CT Page 16388 preventing drunk driving and the attendant tragedies that often result from the operation of a motor vehicle by intoxicated persons. See State v. Lamme, supra, 216 Conn. 184; State v. Pierog, 33 Conn. App. 107, 111-12, 634 A.2d 301 (1993), cert. denied, 228 Conn. 917, 636 A.2d 849 (1994). Because of this pervasive public interest, the officer was not required to wait for erratic driving or an accident to occur before pulling over the defendant.
(Emphasis added.)
For all the foregoing reasons, the motion to suppress is DENIED.
CLIFFORD, J.
CT Page 1