[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTION TO SUPPRESS
The defendant had initially filed a motion to dismiss and a motion to suppress in this action in which the defendant faces charges of driving under the influence pursuant to General Statutes § 14-227a and failure to obey officer's signal pursuant to General Statutes § 14-223
(a).
The defendant's motion to dismiss was based on two grounds: (1) invalid arrest because the arrest was without a warrant in the town of Colebrook by a Winchester police officer and (2) lack of reasonable and articulable suspicion to stop the defendant.
The defendant, through his counsel, waived both these grounds at argument on the motions and in his brief. He concedes that under the circumstances of the arrest, the police officer (Sgt. Thomas Serra, Troop B, Connecticut State Police) had a reasonable and articulable suspicion to make an investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny of cases.
The defendant is pursuing his motion to suppress all statements made subsequent to the stop but prior to being advised of his Miranda rights; see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 699
(1966); as well as all results, officer's observations and conclusions from the field sobriety tests.
"Miranda warnings are not required unless the defendants in custody."State v. Cox, 36 Conn. App. 463, 468, 652 A.2d 520 (1994). "Custody for CT Page 12491Miranda purposes is a factual determination." Id.; see also State v.Ostroski, 186 Conn. 287, 292, 440 A.2d 984 (1982), cert. denied, 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).
A hearing was held on the motion to suppress at which Sgt. Thomas Serra and Trooper Stephen Luba, both Connecticut state police officers from Troop B, testified to the following facts. At approximately 7:00 p.m. on October 28, 2000, Sergeant Serra was on duty and traveling alone in a state police cruiser in an easterly direction on Route 44 in Winsted. A passing truck going westbound attracted his attention because it was exceeding the speed limit and had a loud muffler. Sgt. Serra turned around to follow the truck west on Route 44. A black van was also traveling west on Route 44 and this black van was between Sgt. Serra's cruiser and the truck.
Sgt. Serra activated his cruiser's emergency lights and flashing headlights to signal the van to yield so that he could pass and get behind the truck that was speeding and had the loud muffler. When the van failed to respond, Sgt. Serra activated his siren. The van continued to fail to respond to Sgt. Serra's signal. After traveling approximately another 4/10 mile, the truck began to slow down; however, the van continued to travel at the same speed, rapidly approaching the rear of the truck. The truck veered to the right of the roadway, and the van passed the truck, nearly striking the rear of the truck as it passed.
These actions by the van aroused Sgt. Serra's suspicion and he made the decision to disregard the truck and pursue the van to determine why it had failed to yield to his signal, as well as, why it had almost struck the truck. He followed the van on Route 44 with full lights and siren activated. The van turned right onto Hannafin Road, and continued for approximately 8/10 of a mile without stopping. After the van turned onto Hannafin Road, Sgt. Serra activated his take down lights and spotlight in addition to the emergency lights and siren, in an effort to stop the van. Sgt. Serra moved his spotlight between the side mirrors and the rear view mirror of the van so as to catch the driver's attention. The driver of the van failed to respond to Sgt. Serra's signals.
As the van approached a stop sign, Sgt. Serra passed the van on the left. The van rolled through the stop sign at which point Sgt. Serra pulled his cruiser in front of the van to prevent the van from proceeding any further. At that point Sgt. Serra had a reasonable suspicion that the driver of the van was operating both erratically and evasively. Once the van was stopped, Sgt. Serra exited his cruiser, positioned himself behind his car door, drew his service weapon and shouted for the driver of the van to exit the vehicle. By this time, it was dusk and there was no artificial lighting on Hannafin Road. The driver did not respond to Sgt. CT Page 12492 Serra's commands. Sgt. Serra shouted to the driver to exit the van several more times before the driver opened the door and stumbled out of the vehicle. Sgt. Serra shouted for the driver to turn around and face his vehicle. Sgt. Serra then repeated this command several more times and the driver still failed to comply completely to the command.
As this was taking place an officer with the department of environmental protection had arrived as back-up, so Sgt. Serra holstered his weapon, approached the driver who was later identified as the defendant, and placed him in the cruiser handcuffed. Sgt. Serra's observations of the defendant were that as he spoke, his speech was slurred and he had the smell of alcohol about him.
Sgt. Serra's testimony was that he had his service weapon drawn for approximately thirty seconds. He testified that in his opinion, based on over twenty years experience as a State police officer, there was no other way to handle the situation. He testified that under the circumstances on that evening: that the van driver failed to yield to his signal; that Sgt. Serra could not observe whether there were weapons, other persons or contraband in the van; and that it was getting dark in a rural wooded area with no artificial lighting on the roadway; he felt compelled to draw his weapon for the safety of himself and the community. Sgt. Serra also testified that there were many reasons why a driver might fail to yield to a police signal, including being under the influence of alcohol or drugs, or in possession of contraband or evidence of a crime.
Sgt. Serra testified that within two to three minutes after the defendant was handcuffed and placed in his cruiser, Trooper Luba arrived to assist Sgt. Serra. Sgt. Serra advised Trooper Luba that he had reason to believe that the defendant was under the influence of alcohol based upon these facts: the defendant's failure to yield to Sgt. Serra's signals, that the van nearly struck the truck it had passed; the defendant's refusal and/or inability to respond to commands; the smell of alcohol about the defendant; and the slurred speech and stumbling of the defendant. He asked Trooper Luba to have the defendant perform field sobriety tests. He did not conduct this portion of the investigation himself because he was the supervisor on duty that evening.
Trooper Luba's testimony was that he removed the defendant from Sgt. Serra's cruiser and uncuffed the driver and identified him as the defendant. Trooper Luba testified that he asked the defendant why he failed to yield, where he was coming from, and if he had been drinking, all standard questions used in a driving under the influence investigation. The defendant had not yet been advised of his rights during this questioning. In response, the defendant stated that he CT Page 12493 thought the officer was trying to go around him, that he was coming from McGurk's which is a bar in Winsted, and that he had consumed three beers that night.
Trooper Luba testified his observations of the defendant were that the defendant smelled of alcohol, was unsteady on his feet and had red, glassy eyes. Trooper Luba testified that based upon the defendant's appearance and responses to his questions, as well as, the information received from Sgt. Serra, he had reason to believe that the defendant was under the influence of alcohol. Trooper Luba further testified that even without speaking to the defendant, based solely upon Sgt. Serra's report, he had reason to believe that the defendant was under the influence of alcohol. Based upon that belief, Trooper Luba requested that the defendant perform three field sobriety tests. The defendant failed the tests. Trooper Luba next placed the defendant under arrest, verbally gave the defendant Miranda advertisements and then transported the defendant to the Winsted police station. At the Winsted police station, the defendant was read the written Miranda warnings which the defendant signed. The defendant was next questioned by Trooper Luba relative to answering the questions on the required A-44 form. The defendant was read the implied consent advisement, but he refused to take any chemical tests.
Based on these findings of fact, the court next reviews the law to be applied.
In State v. Beliveau, 52 Conn. App. 475, 481, 727 A.2d 737, cert. denied, 249 Conn. 920, 733 A.2d 235 (1999), the Appellate Court states the test to be applied when a Miranda warning must be given by police.
 "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by Miranda: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." State v. Tomasko, 238 Conn. 253, 267, 681 A.2d 922 (1996).
See also State v. Vitale, 197 Conn. 396, 411, 497 A.2d 856 (1985).
The court went on further in State v. Beliveau, supra,52 Conn. App. 484-85 and analyzed Pennsylvania v. Muniz, 496 U.S. 582,110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), regarding the advisement ofMiranda rights:
 In Pennsylvania v. Muniz, . . . prior to advising the defendant of his Miranda rights, the police CT Page 12494 transported him to the police station. At the station, the police asked the defendant to submit to the "horizontal gaze nystagmus" test, the "walk and turn" test and the "one leg stand" test. . . . The defendant made several incriminating statements while he was attempting to comprehend an officer's instructions and while he was performing those sobriety tests. . . . Additionally, he made incriminating statements when he asked to submit to a Breathalyzer test. . . . The defendant claimed that all of those statements were inadmissible because they were elicited before he had been advised of his Miranda rights. . . .
 The Supreme Court rejected the defendant's claim, holding that the police officer's "dialogue with Muniz concerning the physical sobriety tests . . . contained limited and carefully worded inquiries as to whether Muniz understood . . . instructions [about the sobriety tests], but these focused inquiries were necessarily attendant to the police procedure held by the [state] court to be legitimate. Hence, Muniz's incriminating utterances during this phase of the . . . proceedings were voluntary in the sense that they were not elicited in response to custodial interrogation.". . . Additionally, the court held "that Miranda [did] not require suppression of the statements Muniz made when asked [by the police] to submit to a breathalyzer examination . . . [because] Muniz's statements were not prompted by an interrogation within the meaning of Miranda." . . . The court held that asking the defendant whether he wished to submit to the Breathalyzer test was "necessarily attendant to the legitimate police procedure . . . and [was] not likely to be perceived as calling for any incriminating response."
(Citations omitted.)
The defendant's claim in this action is remarkably similar to that made by the defendant in State v. Braxton, 196 Conn. 685, 495 A.2d 273
(1985). In Braxton, the defendant also conceded that there was sufficient articulable grounds to justify the defendant's original detention but claimed the detention became unreasonably intrusive thereafter, and therefore all materials seized and statements made should be suppressed. Id. 688-89. The court disagreed with the defendant stating: CT Page 12495
 One function of a constitutionally permissible Terry stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to check a description or an identification, so long as his conduct is "strictly tied to and justified by the circumstances which rendered its initiation permissible. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends upon a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect. Id., 689.
(Citations omitted; internal quotation marks omitted.) Id., 689.
Also, the Appellate Court's analysis and review in State v. Wylie,10 Conn. App. 683, 687, 525 A.2d 528, cert. denied, 204 Conn. 807 (1987) is of assistance:
 The fact that the officer had his own weapon drawn when he ordered the defendant to halt did not transform the investigatory stop into an arrest. "What might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when, as here, officers have reason to fear that a suspected criminal is armed. The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness." United States v. Harley, 682 F.2d 398, 402 (2d Cir. 1982).
With the guidance of the caselaw cited, this court reviews the factual findings and concludes as follows:
1) There was reasonable, articulable suspicion to stop the defendant's vehicle on the evening of October 28, 2000, based on the defendant's erratic operation and failure to obey Sgt. Serra's signals to stop.
2) Based on the defendant's reactions once the vehicle was stopped, as well as the location of the stop and the time of the day, it was CT Page 12496 reasonable for Sgt. Serra to draw his weapon for his own safety and that of the public. In addition, based on his observations of the defendant after the defendant exited the vehicle, it was reasonable for Sgt. Serra to detain the defendant in his police cruiser until Trooper Luba's arrival.
3) Trooper Luba's arrival and his taking over the investigation of the defendant relative to whether or not the defendant was operating under the influence of alcohol did not require Miranda warnings until after conducting the field sobriety tests. This is supported by the Appellate Court holding in State v. Gracia, 51 Conn. App. 4, 17, 719 A.2d 1196
(1998):
 The United States Supreme Court has held that questioning at the scene and conducting field sobriety tests does not involve custody for purposes of Miranda. See Pennsylvania v. Bruder, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988). Indeed, we have noted that our case law presumes that such testing is "incident to the initial stop, based on the officer's reasonable suspicion, rather than on the subsequent arrest." State v. Lamme, 19 Conn. App. 594, 601, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484
(1990). We concluded that such roadside testing and questioning based on "a reasonable, articulable suspicion in the absence of probable cause is "clearly warranted' within the meaning of the Connecticut constitution." Id.
Therefore, the court concludes that based on the court's findings of fact, as well as the applicable legal standards to be applied in reviewing Miranda claims in Connecticut, the defendant has failed to sustain his burden relative to his motion to suppress. The motion to suppress is denied.
AGATI, Judge.