******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom EVELEIGH and McDON-ALD, Js., join, concurring. In *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015), a majority of this court concluded that, following the legislature's April, 2012 decision to abolish the death penalty for all future offenses; see Public Acts 2012, No. 12-5 (P.A. 12-5); capital punishment no longer comports with the state constitutional prohibition against cruel and unusual punishment. See *State* v. *Santiago*, supra, 10, 86, 118–19, 140; see also Conn. Const., art. I, §§ 8 and 9. Specifically, we determined that to execute individuals convicted of committing capital felonies prior to April, 2012, now that the legislature has determined that the death penalty is neither necessary nor appropriate for any crimes committed after that date, no matter how atrocious or depraved, would be out of step with contemporary standards of decency and devoid of any legitimate penological justification. See *State* v. *Santiago*, supra, 9, 14–15. Accordingly, we vacated the death sentence of the defendant in that case, Eduardo Santiago, and we ordered that he be resentenced to life in prison without the possibility of release. Id., 140.

The present appeal is brought by another defendant, Russell Peeler, who, like Santiago, committed a capital felony and was sentenced to death prior to the enactment of P.A. 12-5. Ordinarily, our determination in *Santiago* that the death penalty is no longer constitutional would control the outcome of the present case as well, and the defendant and others similarly situated would be entitled to resentencing consistent with our decision in *Santiago*. The state, however, has argued that *Santiago* was decided without the benefit of adequate briefing by the parties and that, as a result, the majority in *Santiago* made a series of legal and historical errors that led to an incorrect decision. Indeed, the state goes so far as to contend that our decision in *Santiago* was so unjust, and so completely devoid of legitimacy, that it should be afforded no precedential value and now may be overturned, only nine months later, merely because the composition of this court has changed.

I agree with and join the per curiam opinion in this case, in which the majority concludes that *Santiago* remains binding and valid authority, and that other convicted capital felons who have been sentenced to death are, therefore, entitled to be resentenced forthwith consistent with that decision. I write separately because I categorically reject any suggestion that the parties did not have the opportunity to brief these issues in *Santiago*, or that the court in that case overlooked key authorities, arguments, or historical developments that, if properly considered, would have resulted in a different outcome. We already have explained at some length

why the parties, and particularly the state, had a full and fair opportunity to address the issues on which our decision in *Santiago* was based. See id., 120–26; see also *State* v. *Santiago*, 319 Conn. 935, 936–40, 125 A.3d 520 (2015) (denying state's motion for stay of execution of judgment in *Santiago* pending resolution of appeal in present case). In this concurring opinion, I briefly address the state's principal historical and legal arguments and explain why they are unpersuasive.

## I

## HISTORICAL ANALYSIS

The state first argues that, in *Santiago*, we "relied on flawed historical analysis to justify [our] departure from well established principles of law . . . ." Specifically, the state contends that we incorrectly concluded that, prior to the adoption of the 1818 constitution, Connecticut courts were authorized to review the constitutionality of allegedly cruel and unusual punishments. In reality, the state contends, the authority to review and determine the propriety of a punishment always has rested solely with the legislature. In so arguing, the state fundamentally misunderstands the relevant Connecticut history, this court's precedents, and the basis of our decision in *Santiago*. Although a full review of the relevant history and the scope of the state's confusion in this regard lies beyond the ambit of this opinion, I briefly address three of the most significant flaws in the state's analysis.

First, the state misperceives the purpose of the discussion in part I of our decision in *State* v. *Santiago*, supra, 318 Conn. 15–46, and the role that that discussion played in the outcome of the case. Our goal in part I of *Santiago* was not to establish that this court has the constitutional authority to strike down legislatively enacted punishments as impermissibly cruel and unusual. There was no need to establish that principle because, as the defendant explains, and as the state ultimately concedes, the state lost that argument decades—if not centuries—ago. Just four years after the adoption of the 1818 constitution, Chief Justice Stephen Titus Hosmer, writing for the Connecticut Supreme Court of Errors, rejected the asserted "omnipotence of the legislature" with respect to punitive sanctions such as imprisonment and clarified that the review of such laws was properly within the purview of the judiciary. *Goshen* v. *Stonington*, 4 Conn. 209, 225 (1822); see also C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 97 (1982) ("the delegates to the Connecticut [c]onstitutional [c]onvention of 1818 overrode the protestations of the Federalist old republicans who still clung to a faith in legislative supremacy and the common law to uphold all of the natural rights of individuals"). More recently, in *State* v. *Lamme*, 216 Conn. 172, 179–80, 579

A.2d 484 (1990), and again in *State* v. *Ross*, 230 Conn. 183, 249, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), we rejected the state's argument that our state constitution confers the authority to determine what constitutes cruel and unusual punishment solely on the legislature.[1] Our purpose in part I of *Santiago*, then, was merely to trace in greater detail than we previously had the origins and contours of our state constitutional freedoms from cruel and unusual punishment. In other words, the question we considered in *Santiago* was the *scope* of the rights at issue, and not which branch of government is charged with securing their enforcement.[2]

The second fundamental flaw in the state's historical analysis is its suggestion that, prior to 1818, Connecticut courts played no role in securing our common-law and statutory freedoms from cruel and unusual punishment. In *Santiago*, we reviewed numerous instances and contexts in which *each* of the three branches of government at times sought to temper what were perceived as cruel or unusual punishments. With respect to the judiciary, for example, we noted agreement among scholars of early Connecticut history that (1) magistrates enforced the criminal law during the colonial period so as to avoid needless cruelty, especially with regard to capital crimes; *State* v. *Santiago*, supra, 318 Conn. 29–31; (2) Connecticut courts began to nullify dubious capital sentences as early as the 1660s; id., 31–32 n.27; and (3) in the years leading up to the adoption of the 1818 constitution, "courts were adopting a milder practice in applying the capital law." (Internal quotation marks omitted.) Id., 36. Indeed, the very source on which the state relies explains at the outset how this preconstitutional history sowed the seeds that ultimately blossomed into this court's judicial review authority: "When we speak of law in early Connecticut—legislation, adjudication, and executive administration—we speak of the law of the magistrates." E. Goodwin, The Magistracy Rediscovered: Connecticut, 1636–1818 (1981) p. 11. "The Puritan's peculiar concept of the magistracy was . . . a unique contribution to the development of later concepts of independent judiciaries, distinct functions for courts of law, and even, perhaps, the distinctively American notion of judicial review." Id. In *Lamme*, having reviewed this history, we concluded that "the most significant aspect of the pre-1818 declaration of rights is that it had constitutional overtones even though it was statutory in form. The [d]eclaration and supplementary statutes relating to individual rights were grounded in the Connecticut common law and viewed as inviolate. Abridgements perpetrated by the government were considered void on their face *and courts were to refuse to enforce them*." (Emphasis added; internal quotation marks omitted.) *State* v. *Lamme*, supra, 216 Conn. 179, quoting C. Collier, supra, 15 Conn. L. Rev. 94; see also *Binette* v. *Sabo*, 244 Conn. 23, 79, 710 A.2d 688 (1998)

(*Katz, J.*, concurring in part and dissenting in part). Accordingly, although the state is certainly correct that the legislature played a central role in establishing and enforcing our traditional freedoms from cruel and unusual punishment during Connecticut's preconstitutional era, the state has offered no reason to conclude, counter to well established authority, that the legislature has been the exclusive guardian of those freedoms.[3]

Of course, any discussion of the relationship between the judicial and legislative authorities during the preconstitutional era, and especially prior to the creation of this court in 1784, must be qualified by the recognition that the General Court, which, at the end of the seventeenth century, was renamed the General Assembly, blended and simultaneously exercised both judicial and lawmaking functions during that period. See, e.g., H. Cohn & W. Horton, Connecticut's Four Constitutions (1988) p. 21; E. Goodwin, supra, pp. 33–35, 52–54. In some sense, then, any discussion of whether the legislature or the judiciary was responsible for securing the people's freedom from cruel and unusual punishment is academic. In any event, it is clear that the adoption of the state's first formal constitution in 1818 was motivated in no small part by a desire to create an independent judiciary tasked with securing those basic constitutional liberties, and that these changes embodied a rejection of the belief "that republican government with legislative supremacy was the best safeguard of personal liberties." (Internal quotation marks omitted.) *State* v. *Lamme*, supra, 216 Conn. 180; see also *Starr* v. *Pease*, 8 Conn. 541, 546–48 (1831) (declaration of rights contained in 1818 constitution imposed limitations on excessive powers previously wielded by legislature); H. Cohn & W. Horton, supra, p. 23 (call for independent judiciary was primary reason for constitutional convention).

The third fundamental flaw in the state's historical analysis is the state's failure to adequately and accurately document its theory that the freedoms from cruel and unusual punishment enshrined in the state constitution arose from and were limited to legislative efforts to circumscribe the harsh and arbitrary punishments imposed by colonial magistrates. Although the state weaves a lengthy and intriguing narrative in support of this theory, the state's account is sparse on citation, and, it must be said, one searches the cited authorities in vain for the propositions that the state attributes to them. Nowhere in the cited text, for example, does Professor Lawrence B. Goodheart state that the Ludlow Code of 1650—from which article first, § 9, of the state constitution derives its origins—was drafted to address public concerns that magistrates were wielding excessive power or imposing arbitrary penal sanctions. See L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut (2011) pp. 11–12. Quite the contrary. In the section of his book on which the state

relies, Goodheart explains that the colonists generally deferred to magistrates' interpretation of Biblical authority; see id., p. 9; and he discusses at some length the key role that the magistrates played in securing fundamental liberties and tempering the colonies' draconian capital statutes: "The statutes are deceptive as to what occurred in practice. The laws represented a religious ideal, a public declaration, as the 1672 [colonial] code put it, of what was 'suitable for the people of Israel.' The judicial system was much more lenient. The courts aspired to be scrupulous and fair. There was concern to balance individual protection with the greater good. Drawing on centuries of English tradition, the Puritans upheld civil rights, including . . . no torture [and] no cruel or barbarous punishments . . . . Attorneys did not usually function in either colony; the wise and impartial rule of the magistrates was deemed sufficient." (Footnotes omitted.) Id., p. 14.

The state's reliance on Everett Goodwin's book, The Magistracy Rediscovered: Connecticut, 1636–1818, is similarly misplaced. The state cites page 103 of Goodwin's book for the proposition that, in the state's words, "Connecticut's history is unique in selecting the legislature as the body 'safeguarding' citizens from abusive, unlegislated, court-imposed punishments, and not the other way around." The cited passage, however, contains no mention whatsoever of abusive, court-imposed punishments. Rather, Goodwin merely discusses the fact that, as a general matter, Connecticut's early legal system relied less on English common law than did the other American colonies. E. Goodwin, supra, p. 103. He also references the evolution in Chief Justice Zephaniah Swift's thinking with respect to the separation of powers; although Swift initially believed in the primacy of the legislature; see id., pp. 99–100, 103; he ultimately came to conclude that, because the legislature is vulnerable to " 'undue and improper influence' "; id., p. 114; the courts must play an important role with respect to the constitutional review of statutes. See id., pp. 99, 101, 103, 109–10, 114, 160 n.34. In other parts of his book, Goodwin explains that the colonists codified an extreme version of the criminal law but "[left] the mitigation to the discretion of the [m]agistrate"; (internal quotation marks omitted) id., p. 27; and that the discretion invested in the magistrates reflected the Puritans' confidence in their wisdom and godliness. Id., p. 30. Like Goodheart, then, Goodwin provides little support for the state's account.

The other sources on which the state relies likewise fail to support—and in some cases flatly belie—the state's theory that Connecticut's traditional freedoms from cruel and unusual punishment originated from and were limited to a commitment to statutory law as a bulwark against abusive judicial sentencing practices. William Holdsworth, for example, explains that magistrates in both the Connecticut and New Haven colonies

"repeatedly avoided imposing the full penalties prescribed by . . . [law]"; W. Holdsworth, Law and Society in Colonial Connecticut, 1636–1672 (1974) p. 124 (unpublished doctoral dissertation, Claremont Graduate School); and that, although Connecticut's first criminal statutes were more severe than those of Massachusetts, Connecticut's colonial code actually "placed fewer restrictions on the discretionary powers of the magistrates, and increased the penalties they could impose for certain crimes . . . ." Id., p. 132. Holdsworth explains that "these differences reflect a greater consensus in Connecticut between rulers and ruled and a greater degree of trust of the one for the other, but they also reflect the *growth* in magisterial power . . . ." (Emphasis added.) Id.[4] The state's heavy reliance on the language of Ludlow's Code also misses the point. Ludlow's Code authorized not only those punishments established by express legislative enactment, but also, in the absence of a controlling statute, penal sanctions imposed on the basis of the magistrates' own understanding of "the word of God." (Internal quotation marks omitted.) L. Goodheart, supra, p. 12.

Even more troubling is the state's representation that this court's decision in *Pratt* v. *Allen*, 13 Conn. 119, 125 (1839), stands for the proposition that, "[w]ith the exception of moving the judiciary to an independent body, the 1818 constitution *'left the legislative department as it found it.'* " (Emphasis added.) The state uses the quoted passage from *Pratt* in an attempt to demonstrate that the judiciary, which, the state alleges, had no authority to review the appropriateness of legislatively imposed punishments under the colonial common law, obtained no greater authority in this respect under the 1818 constitution. The state, however, neglects to account for the sentence in *Pratt* immediately preceding the one that it quotes. The full passage reads as follows: "The [constitution of Connecticut], so far as it respects the legislature, is conversant principally with its organization, the authority of its separate branches, and the privileges of its members. But we look in vain for the character of its legislative acts *any further than as they are, in some measure, restrained, by the bill of rights*. In short, *with few limitations*, it left the legislative department as it found it." (Emphasis added.) *Pratt* v. *Allen*, supra, 125. The only fair reading of *Pratt*, then, is that the creation of an independent judiciary was *not* the only change effected by the state constitution, as the state suggests. Rather, the highlighted portions of the foregoing passage, which the state omits, clearly indicate that the constitution, in tandem with the creation of an independent judiciary, constrained the authority of the legislature to enact laws that infringe our basic liberties.

A thorough review of the cited historical sources and our related cases thus leaves one with the discomforting impression that the state, in its apparent zeal to retain

the death penalty, has mischaracterized not only this court's precedents but history itself. For all of these reasons, I reject the state's contention that this court, in *Santiago*, relied on a flawed historical analysis or exercised its powers of judicial review in a manner precluded by either tradition or precedent.

## II

### DELAYS AND INFREQUENCY OF IMPLEMENTATION

The state's next argument is that, in *Santiago*, we improperly considered the infrequency with which the death penalty is imposed in Connecticut, as well as the lengthy delays in carrying out capital sentences, in determining that capital punishment no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose. Specifically, the state contends that (1) this court rejected these arguments in *State* v. *Rizzo*, 303 Conn. 71, 191–94, 31 A.3d 1094 (2011), cert. denied,    U.S.    , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012), (2) nothing has changed since our decision in *Rizzo* to justify a different outcome, and (3) in any event, our conclusion that delays in carrying out capital sentences render the punishment unconstitutional is precluded by this court's decision in *State* v. *Smith*, 5 Day (Conn.) 175 (1811). I consider each argument in turn.

Nothing in our decision in *Rizzo* precluded the result we reached in *Santiago*. In *Rizzo*, we looked at the growing infrequency of capital sentencing and executions throughout the country. See *State* v. *Rizzo*, supra, 303 Conn. 192–94 and nn. 89–94. At that time, we did not reject out of hand the argument of the defendant, Todd Rizzo, that the death penalty had come to be so rarely used in the United States as to constitute cruel and unusual punishment. Nor did we specifically consider recent developments in this state. Rather, we recognized that both capital sentences and executions were declining in number nationwide, and we acknowledged that several of the likely causes of those declines suggested diminishing public support for capital punishment. See id., 192–94. At the same time, however, we noted that the decline also might reflect other, short-term factors, such as the economic recession, supply shortages of one of the lethal injection drugs, and temporary uncertainty about the legal status of capital punishment pending the United States Supreme Court's decision in *Baze* v. *Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). *State* v. *Rizzo*, supra, 192–94. We also noted that the number of executions carried out nationally in 2007 and 2008, although a recent low, remained substantially higher than during the early 1990s, just prior to our decision in *State* v. *Ross*, supra, 230 Conn. 183. See *State* v. *Rizzo*, supra, 192. Accordingly, and in light of the fact that capital punishment remained legal in most states; see id., 190; we could

not conclude at that time that infrequency of imposition alone was sufficient evidence that the death penalty had become impermissibly cruel and unusual. See id., 194. Because capital punishment remained legal, and so presumably retained some deterrent value, we also did not have cause at that time to consider whether lengthy delays in carrying out capital sentences deprived capital punishment of its retributive value.

Much has changed since *Rizzo*. Two additional states—Maryland and Nebraska—have abolished capital punishment.[5] The number of executions carried out nationally has continued to decline, falling by more than one third from 2011 to 2015, and is now lower than at any time since 1991.[6] The number of new capital sentences imposed likewise continues to fall; the total fell by nearly 40 percent between 2011 and 2015, and is now by far the lowest of the post-*Furman*[7] era.[8] It has been more than one decade since the last execution was carried out in New England (Michael Ross, who essentially volunteered to die, in 2005), and more than five decades since the one before that (Joseph Taborsky in 1960). That this is all true even though many of the short-term factors we considered in *Rizzo* no longer apply strongly suggests that the persistent, long-term declines in capital punishment are just what they appear to be—evidence that contemporary standards of decency have evolved away from execution as a necessary and acceptable form of punishment. Significantly, the Death Penalty Information Center has published its 2015 year-end summary, and the statistics for 2015 continue to reflect a substantial decline in the imposition and implementation of the death penalty nationwide.[9] If anything, the pace of decline is accelerating.

Since our decision in *Rizzo*, a number of respected jurists also have concluded that the infrequent imposition and delayed execution of the death penalty call its constitutionality into question. See, e.g., *Glossip* v. *Gross*, U.S. , 135 S. Ct. 2726, 2764–76, 192 L. Ed. 2d 761 (2015) (Breyer, J., with whom Ginsburg, J., joins, dissenting); *Jones* v. *Chappell*, 31 F. Supp. 3d 1050, 1065–67 (C.D. Cal. 2014) (Carney, J.), rev'd sub nom. *Jones* v. *Davis*, 806 F.3d 538 (9th Cir. 2015). At the same time, new legal scholarship has emerged that powerfully debunks the state's argument that the rarity with which the death penalty is imposed in Connecticut merely indicates that our capital felony statutes are working as intended, and that the ultimate punishment is being reserved for the very worst offenders.[10]

Most significant, however, is the fact that, in 2012, the year after we decided *Rizzo*, the legislature enacted P.A. 12-5, which prospectively abolished the death penalty in Connecticut. Legislative abolition fundamentally altered the constitutional calculation we conducted in *Rizzo*. It cast in a new light all of the various factors pointing to reduced societal acceptance of capital pun-

ishment. It swept away the most compelling arguments that capital punishment serves legitimate penological functions. And it reflected the awareness of the legislature that the infrequency with which the death penalty is imposed and the slowness with which it is carried out dramatically undermine its ability to serve a valid retributive function and to secure justice and peace for the families of murder victims. See *State* v. *Santiago*, supra, 318 Conn. 103 and n.99. In light of these dramatic, recent changes in the constitutional landscape, it is difficult to comprehend how the state can argue with a straight face that "[t]here is nothing new under the sun . . . ." (Footnote omitted.)

Lastly, I am not persuaded by the state's assertion that *State* v. *Smith*, supra, 5 Day (Conn.) 175, a case decided two decades before the invention of the typewriter, somehow precludes the result this court reached in *Santiago*. *Smith* was the first published case in which this court considered whether two sentences of imprisonment may be imposed to run consecutively without offending the state's common-law prohibition against cruel and unusual punishment. See id., 178. Because "such ha[d] been the usage of our courts, for many years past," we concluded that postponing the commencement of the second term of imprisonment until the first had been completed was neither unprecedented nor cruel. Id., 179. Nowhere in the court's brief discussion of that issue, however, did it consider or decide any of the novel questions raised in *Santiago* and in the present appeal: (1) whether a method of punishment that is only imposed a few times per decade and only carried out a few times per century may be deemed to violate contemporary standards of decency; (2) whether the retributive value of a punishment—both to the offender and to the victims—dissipates when decades pass before it is carried out; and (3) whether the various procedural safeguards established by the federal and state legislatures and courts, which permit individuals on death row to pursue nearly endless appellate and postconviction remedies, reflect society's reluctance to impose the ultimate punishment and unwillingness to see it imposed erroneously. For these reasons, there is no doubt that, in *Santiago*, we properly considered the actual practices of this state with respect to the imposition and carrying out of capital sentences in concluding that capital punishment constitutes what has come to be seen as cruel and unusual.

## III

## RACIAL DISPARITIES AND PROSECUTORIAL DISCRETION

The state next contends that, in *Santiago*, when we observed that "the selection of which offenders live and which offenders die appears to be inescapably tainted by caprice and bias"; *State* v. *Santiago*, supra, 318 Conn. 106–107; we improperly relied on statistical

evidence suggesting that people of color who offend against white victims are more likely than other offenders to be capitally charged and sentenced to death. The state argues that (1) a court in a habeas case currently pending on appeal before this court rejected these statistical claims; see *In re Death Penalty Disparity Claims*, Docket No. TSR-CV-05-4000632-S, 2013 WL 5879422 (Conn. Super. October 11, 2013); (2) studies that have documented racial disparities in other jurisdictions are not relevant to this state because, in the 1970s, Connecticut enacted the narrowest capital sentencing scheme in the country, and (3) in any event, such claims were not properly before us in *Santiago*.

The short answer to the state's arguments is simply to reiterate what we stated in *Santiago*: the question whether there are presently statistically significant racial disparities in the imposition of the death penalty in Connecticut was not before us in that case, as it is not before us in the present case, and we did not reach or rely on any such conclusion in holding the death penalty unconstitutional. See *State* v. *Santiago*, supra, 318 Conn. 109 n.104. What we did consider in *Santiago*—on the basis of an abundance of legal scholarship, persuasive federal and state authority, a thorough review of the relevant history, and our knowledge of human nature—was the proposition that any sentencing scheme that allows prosecutors not to seek and jurors not to impose the death penalty for any reason "*necessarily opens the door*" to caprice and bias of various sorts, racial or otherwise. (Emphasis added.) Id., 108. In other words, we agreed, as a matter of law, with those judges and scholars who have concluded that such a system cannot, in principle, ensure that the ultimate punishment will be imposed fairly and objectively, as it must be. The factual question of the extent to which the undisputed facial disparities in Connecticut's capital charging and sentencing system do in fact result from subconscious racial biases never entered into our analysis.[11]

The state's argument to the contrary—that Connecticut law does not afford jurors unlimited discretion to find mitigating factors—is unavailing. "It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights . . . ." (Internal quotation marks omitted.) *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993); see also *State* v. *Santiago*, supra, 318 Conn. 18–19 (rule applies to eighth amendment protections). The United States Supreme Court repeatedly has instructed that juries must retain the discretion to consider any potentially mitigating factors when deciding whether to impose a capital sentence,[12] and the supremacy clause of the federal constitution bars both our legislature and this court from abridging that discretion. It is true that the United States Supreme Court has explained, and we have recognized, that the states remain free to chan-

nel the *manner* in which jurors exercise their broad discretion, such as by instructing that mitigating factors should be considered in light of "all the facts and circumstances of the case." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 284; see also id. (ultimately concluding that "[t]he instructions as given did not preclude the jury from giving mitigating force to *any* fact, taken alone or taken in conjunction with any other facts presented" [emphasis added]). Ultimately, however, there is nothing in the law of Connecticut or in this court's precedents that prevents a capital jury from considering racial, ethnic, or other such factors when deciding whether to impose the ultimate punishment. None of the cases cited by the state are to the contrary.

Because we did not rely on any factual finding of recent racial disparities in *Santiago*, and we do not do so now, it is not necessary to address fully the state's first and second arguments. I would, however, briefly note my disagreement with each.

With respect to *In re Death Penalty Disparity Claims*, I do not understand the court in that case to have rejected the petitioners' claim that there is statistically significant evidence that people of color who kill white victims are capitally charged, and thus placed at risk of death, at a much higher rate than are other offenders, and that those disparities cannot reasonably be accounted for by innocuous, nonracial factors. Rather, I understand the court to have acknowledged that there are significant racial disparities in capital charging (but not sentencing) in Connecticut; see *In re Death Penalty Disparity Claims*, supra, 2013 WL 5879422 *19, *24–*25; but to have concluded that, as a matter of federal constitutional and discrimination law, such disparities do not impair the validity of capital sentences imposed in this state. See id., *7, *10, *16–*18, *22–*25. The court further concluded, as a matter of law, that the constitution of Connecticut affords no greater protections than does federal law in this regard. Id., *3, *8. Whether the court in *In re Death Penalty Disparity Claims* was correct with respect to the latter conclusion is a question that this court has yet to answer.

Turning to the state's second argument, I am troubled by its repeated contention that the abundant evidence of racial disparities in other jurisdictions is irrelevant to the Connecticut experience because, "[i]n response to *Furman* [v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)], Connecticut enacted the narrowest capital sentencing scheme in the country." The state relies on the following footnote in a 1980 law review article to support its proposition: "Connecticut's capital punishment law is unique in one regard. It enumerates five mitigating circumstances. But it states that the sentence shall not be death, if any mitigating factor exists,

whether statutorily defined or not. In other words, unlike the practice in every other state (except to some extent Colorado), a Connecticut jury, once it finds a mitigating fact, whether enumerated or not, does not have the power to balance or weigh the mitigating fact against any aggravating fact that may be present. The very existence of a mitigating fact precludes a death sentence." S. Gillers, "Deciding Who Dies," 129 U. Pa. L. Rev. 1, 104 n.10 (1980). Setting aside the question of whether the quoted passage even stands for the proposition for which the state cites it, the state is well aware that Connecticut's capital punishment law has *not* been as Gillers describes it for more than two decades. In 1995, the legislature amended General Statutes (Rev. to 1995) § 53a-46a to eliminate the provision on which the state relies. See Public Acts 1995, No. 95-19, § 1. Since then, juries in capital cases in Connecticut have balanced aggravating and mitigating factors in deciding whether to impose the ultimate punishment, just as they do in our sister states. In addition, any past idiosyncrasies in Connecticut's capital *sentencing* scheme are simply irrelevant to the central question of whether minority defendants accused of offending against white victims are capitally *charged* at a disproportionately high rate.

IV

EXECUTION OF THE INNOCENT

The state next contends that, in *Santiago*, we improperly considered the possibility that an innocent person may be erroneously executed as one reason why the death penalty fails to serve a legitimate retributive purpose. Although the state does not dispute the growing body of research that recently persuaded two justices of the United States Supreme Court that capital punishment is likely unconstitutional for this reason; see *Glossip* v. *Gross*, supra, 135 S. Ct. 2756–59 (Breyer, J., with whom Ginsburg, J., joins, dissenting); the state contends that the possibility of error is no longer a concern in this state because none of the eleven men currently subject to a sentence of death in Connecticut has professed his innocence.

Even if this were true, and even if it were properly subject to judicial notice, the state simply ignores the fact that, under P.A. 12-5, new prosecutions can still be brought at any time for capital felonies committed prior to April, 2012. Of the thousands of murders committed in Connecticut over the past several decades, some of which would be death eligible, many remain unsolved.[13] Accordingly, it is not at all unlikely that, if the death penalty were to remain available, the state would continue to seek it for some who have been accused of committing those crimes, with the possibility that an innocent person could wrongly be sentenced to die. Indeed, in the four years since the legislature prospectively abolished capital punishment, one additional

offender has been sentenced to death,[14] and at least one other likely would have been capitally charged if not for our decision in *Santiago*.[15] The state is fully aware of this possibility, as both the majority and a dissenting justice discussed it in *Santiago*. See *State* v. *Santiago*, supra, 318 Conn. 106 and n.102; id., 397 (*Espinosa, J.*, dissenting). I am, therefore, perplexed as to why the state continues to press this argument.

V

STATUTORY INTERPRETATION

The state next contends that, in *Santiago*, we improperly departed from our ordinary approach to questions of statutory interpretation. The basis of the state's objection is not entirely clear. For example, the state contends that, in *Santiago*, we failed to make what it considers to be "the required predicate finding that the language of [P.A. 12-5] itself is ambiguous," but, in the very next paragraph of its brief, the state quotes our conclusion in *Santiago* that "the policy judgments embodied in the relevant legislation are ambiguous." *State* v. *Santiago*, supra, 318 Conn. 89; see also id., 89 n. 91 (discussing textual ambiguity); id., 59–73 (considering competing interpretations of statutory text). More fundamentally, the state appears to assume that *Santiago* presented a conventional question of statutory interpretation, for which we are constrained to follow the dictates of General Statutes § 1-2z, which embodies the plain meaning rule. At the same time, the state also appears to recognize that claims that a penal sanction constitutes cruel and unusual punishment are reviewed according to a unique standard of review that requires us to assess "what a penal statute *actually indicates* about contemporary social mores." (Emphasis in original.) Id., 72 n.62.

In any event, to the extent that it was not transparent from our decision in *Santiago*, I take this opportunity to clarify that a claim that a penal sanction impermissibly offends contemporary standards of decency is not a question of statutory interpretation subject to § 1-2z and the attendant rules of construction.[16] When a reviewing court considers whether a challenged punishment is excessive and disproportionate according to current social standards, legislative enactments are just one—albeit the most important—factor to be considered. Moreover, our goal in evaluating those enactments is not merely to determine what the legislature intended to accomplish through the enabling legislation (the touchstone of statutory interpretation), but also to understand what the legislation *says and signifies* about our society's evolving perspectives on crime and punishment. In that respect, we look not only to the words of the statute, but also to its legislative history, the aspirations and concerns that were before the legislature as it deliberated, and, to the extent we can perceive them, the political motivations and calculations

that affected or effected the outcome of those deliberations. The latter, as much as anything else, offer a portal into what the final legislative product indicates about our contemporary standards of decency.

## VI

### RETRIBUTION AND VENGEANCE

The state next argues that, in *Santiago*, we incorrectly concluded that the death penalty now lacks any legitimate penological purpose because, among other things, the legislature's decision to retain it on a retroactive only basis was intended primarily to satisfy a public thirst for vengeance toward two especially notorious inmates, rather than to accomplish permissible retributive purposes. The state counters that (1) the legislature regularly and properly crafts penal statutes in response to public reactions to specific notorious and vicious crimes, and (2) P.A. 12-5 was crafted to make good on a promise to the families of murder victims that death would be repaid with death, and making good on such a promise is a legitimate manifestation of retributive justice.

Although it is undoubtedly true that the legislature is naturally responsive to powerful public sentiments, in the arena of criminal law as in other areas, that alone does not insulate a penal statute from constitutional scrutiny. As we explained in *Santiago*, if the mere fact that a punishment arose out of the democratic process established that it served a legitimate penological purpose, then the eighth amendment and its state constitutional counterparts would be largely superfluous. See id., 134–35. Rather, as the United States Supreme Court explained in *United States* v. *Brown*, 381 U.S. 437, 85 S. Ct. 1707, 14 L. Ed. 2d 484 (1965), "in a representative republic . . . [in which] the legislative power is exercised by an assembly . . . [that] is sufficiently numerous to feel all the passions [that] actuate a multitude . . . yet not so numerous as to be incapable of pursuing the objects of its passions . . . barriers [must] be erected to ensure that the legislature [does] not overstep the bounds of its authority . . . ." (Emphasis omitted; internal quotation marks omitted.) Id., 443–44. "Nothing is more common than for a free people, in times of heat and violence, to gratify momentary passions, by letting into the government principles and precedents [that afterward] prove fatal to themselves." (Internal quotation marks omitted.) Id., 444. The court further emphasized that, in a government of divided powers in which each checks the others, the judiciary must play a central role in tempering the legislature's "[peculiar] susceptib[ility] to popular clamor," especially with respect to the levying of punishments against particular infamous persons. (Internal quotation marks omitted.) Id., 445. It is that task that we undertook in *Santiago*.

With respect to promises made to families and friends of the victims, we all have deep compassion for those who have been made to suffer the curse of crime. See, e.g., *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 772, 12 A.3d 817 (2011). As we explained in *Santiago*, however, whatever vows the state has made that it will seek and impose the ultimate penalty have proved to be unkeepable. Of the thousands of heinous murders that have been committed in Connecticut in the last six decades, only two have resulted in executions, and those only after the offenders renounced their appellate and habeas remedies and, in essence, volunteered to die. For the countless other families and secondary victims, the promise that they will find "restoration and closure"[17] in the hangman's noose, or an infusion of sodium thiopental, has proved to be a false hope. The vast majority of even the worst of the worst offenders are never sentenced to die, and, for the minuscule number who are, the delays are endless. Accordingly, although I am sensitive to the state's plea, I remain convinced that the death penalty, as it has been implemented in Connecticut over the past one-half century, serves no useful retributive purpose.[18]

## VII

### CONSTITUTIONAL TEXT

The state next argues that the death penalty can never be held unconstitutional because "it is expressly permitted by the Connecticut constitution." The state further argues that our reliance in *Santiago* on *People* v. *Anderson*, 6 Cal. 3d 628, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972);[19] see *State* v. *Santiago*, supra, 318 Conn. 131; was misplaced because that decision has been the subject of some judicial and scholarly criticism. Instead, the state recommends for our consideration a concurring opinion authored by Justice Antonin Scalia, who opines that "[i]t is impossible to hold unconstitutional that which the [c]onstitution explicitly contemplates." (Emphasis omitted.) *Glossip* v. *Gross*, supra, 135 S. Ct. 2747 (Scalia, J., concurring).

The dissenting justices in *Santiago* raised similar objections. See, e.g., *State* v. *Santiago*, supra, 318 Conn. 246–47 (*Rogers*, *C. J.*, dissenting); id., 353–54 (*Zarella*, *J.*, dissenting). The majority responded to them at some length in that decision; see id., 129–32; and no useful purpose would be served by rehashing those arguments here. I would, however, make a few additional points.

Regardless of whether one considers *Anderson* itself to be persuasive authority, recent scholarship both vindicates the reasoning of that case and sheds light on the defects in Justice Scalia's position. As Professor Joseph Blocher explains, "some supporters of the death penalty continue to argue . . . that the death penalty must be constitutional because the [f]ifth [a]mendment

explicitly contemplates it. The appeal of this argument is obvious, but its strength is largely superficial, and is also mostly irrelevant to the claims being made against the constitutionality of capital punishment. At most, the references to the death penalty in the [constitution] may reflect a founding era assumption that it was constitutionally permissible at that time. But they do not amount to a constitutional authorization; if capital punishment violates another constitutional provision, it is unconstitutional." J. Blocher, "The Death Penalty and the Fifth Amendment" (December 16, 2015) p. 1 (unpublished manuscript), available at http://scholarship.law. duke.edu/cgi/viewcontent.cgi?article=6227&context= faculty_scholarship; see also B. Ledewitz, "Judicial Conscience and Natural Rights: A Reply to Professor Jaffa," 10 U. Puget Sound L. Rev. 449, 459 (1987) ("The fifth amendment represents a limitation on capital punishment, that it was not to be carried out in the future as it had been in the past. One could hardly call the due process clause an endorsement of capital punishment.").

The state's argument appears to be that, with respect to the Connecticut constitution in particular, the due process clause of article first, § 8, cannot form the basis for holding capital punishment unconstitutional when that same clause authorizes the state to impose the death penalty, as long as it affords adequate due process of law. As the aforementioned authorities explain, however, this argument rests on two conceptual errors. First, a declaration of rights such as that contained in article first of the Connecticut constitution, or the federal Bill of Rights, is not a grant of governmental authority; rather, it delineates the rights and freedoms of the people *as against the government*. See *State* v. *Conlon*, 65 Conn. 478, 488–89, 33 A. 519 (1895); see also J. Blocher, supra, pp. 3, 8–9. For the state to suggest that one right (to be free from cruel and unusual punishment) bars the exercise of another *right* (presumably, to execute capital felons) is to fundamentally misunderstand the nature of the freedoms enshrined in article first. States have powers, and the people have rights vis-à-vis the exercise of those powers; there is no governmental *right* to kill.

A second, related conceptual error is the state's apparent failure to distinguish necessary from sufficient conditions. See J. Blocher, supra, p. 9. Article first, § 8, of the Connecticut constitution, as amended by article seventeen and twenty-nine of the amendments, which provides in relevant part that "[n]o person shall be . . . deprived of life . . . without due process of law . . . [or] held to answer for any crime, punishable by death . . . unless upon probable cause," indicates that, to the extent that the death penalty is otherwise permissible and authorized by law, it may be imposed only after the defendant is afforded adequate due process. In other words, due process is a *necessary* condition for the

imposition of the death penalty, and article first, § 8, as amended, thereby restricts the circumstances under which that penalty may be imposed. There is no textual support, however, for the state's apparent belief that article first, § 8, as amended, makes the provision of due process a *sufficient* condition for the imposition of capital punishment, so that the state is authorized to carry out executions as long as it has complied with the requirements of due process. Of course, as we explained in *State* v. *Ross*, supra, 230 Conn. 249–50, the fact that the founders expressly referenced capital punishment in the state constitution, and the fact that such references were retained when article first, § 8, was amended at the most recent constitutional convention in 1965, provides strong evidence that, at those times, capital punishment was seen to be a legal and permissible penalty that comported with standards of decency of the day. But that implies at most that the death penalty is not unconstitutional per se, at all times and under all circumstances. As Blocher explains, "one could grant Justice Scalia's argument that the death penalty is not 'categorically impermissible' while maintaining that the conditions for its constitutional use are not currently satisfied and perhaps never will be." J. Blocher, supra, p. 5.

### VIII

### STARE DECISIS

Lastly, the state argues that, to the extent that *Santiago* was wrongly decided and resulted in an unjust outcome, the principle of stare decisis, that is, the duty of a court to adhere to established precedent, does not require that we uphold the conclusion that capital punishment offends the state constitution. The state itself concedes, however, that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Alvarez*, 257 Conn. 782, 793–94, 778 A.2d 938 (2001). The state has provided neither reasons nor logic to justify overruling our recent decision in *Santiago*.[20]

First, having fully reviewed the state's arguments and the authorities on which it relies, I find no reason to conclude that *Santiago* was wrongly decided, let alone unjust. The state has not pointed to any controlling cases that we overlooked, persuasive arguments that we failed to consider, or fatal defects in our reasoning. Most of the state's arguments are ones that we expressly considered and rejected in *Santiago*, and the others fail to hold up under scrutiny or simply miss the point. In a disturbing number of instances, the authorities on which the state relies do not even support the proposition for which the state cites them.

Second, the state has failed to identify any case, and I am not aware of any, in which a court of last resort

has reversed its own landmark constitutional ruling after a matter of just months. For this court to entomb the death penalty in *Santiago*, and then to exhume and revivify it nine months later, would be unprecedented and would make a mockery of the freedoms enshrined in article first of the state constitution. If the people of Connecticut believe that we have misperceived the scope of that constitution, it now falls on them to amend it.[21]

Finally, I question whether a decision in this case to overrule *Santiago*, and to revive the death penalty for the defendant in the present case, could survive federal constitutional scrutiny. The defendant in *Santiago* has received the benefit of our decision therein, namely, that capital punishment is an excessive and disproportionate punishment, and that he no longer may be executed. The state now proposes that we reauthorize the death penalty[22] and proceed to execute the defendant, Peeler, solely on the basis of the fact that a different panel of this court, having considered essentially the same arguments only months later, might reach a different result. Nothing could be more arbitrary than to execute one convicted capital felon who committed his offense prior to the enactment of P.A. 12-5 but to spare another, solely on the basis of the timing of their appeals. For this reason as well, I reject the state's request that we overrule *Santiago* and revive the death penalty in Connecticut.

[1] The state, while ultimately acknowledging that the court in *Ross* "employed an independent analysis of the facial validity of a [capital] sentence," suggests that we did so principally to review the procedural safeguards that must be followed before the death penalty may be imposed, and not to review the constitutionality of the punishment itself. This argument ignores the fact that, in both *State* v. *Ross*, supra, 230 Conn. 245–52, and *State* v. *Rizzo*, 303 Conn. 71, 184–201, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012), we purported to conduct a comprehensive analysis of precisely the question presented in *Santiago* and the present case, namely, whether, as a general matter, the death penalty had come to offend the state constitutional prohibition against cruel and unusual punishment, either because it fails to comport with contemporary standards of decency or because it no longer serves any legitimate penological purpose. The fact that capital punishment survived constitutional scrutiny in *Ross* and *Rizzo* but failed to do so in *Santiago* does not indicate that we applied a less deferential standard of review in the latter case, as the state contends. Rather, it simply reflects the fact that the legislature's prospective abolition of the death penalty in 2012 fundamentally reshaped the penological landscape and thus altered our constitutional calculation.

[2] I further note that the state's argument that our reliance on *State* v. *Smith*, 5 Day (Conn.) 175 (1811), was misplaced because that decision failed to address the constitutionality of the sentence at issue proves little and less. I will return to the holdings and implications of *Smith*. For now, suffice it to say that one should not expect that a case decided in 1811, seven years before the adoption of this state's first formal constitution, would speak to the constitutionality of the sentence in question. Rather, to reiterate, in *Santiago*, we cited to pre-1818 authority such as *Smith* and *Lung's Case*, 1 Conn. 428 (1815), merely as evidence of the well established common-law freedoms from cruel and unusual punishment that were incorporated into the due process provisions of the 1818 constitution. This court's power of judicial review was never in question.

[3] The other cases on which the state relies are readily distinguishable or otherwise fail to support the propositions for which the state cites them. See, e.g., *State* v. *Lamme*, supra, 216 Conn. 183 (indicating that cases on which state relies in construing article first, § 9, are not binding precedent);

*State* v. *Davis*, 158 Conn. 341, 358–59, 260 A.2d 587 (1969) (relying on fact that five successive legislatures had declined to abolish death penalty in holding that penalty complied with *federal* constitution), vacated in part, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972); *State* v. *Williams*, 157 Conn. 114, 120–21, 249 A.2d 245 (1968) (when sentence that ultimately was imposed was not illegal, failure of jail physician to provide certain medication prior to trial did not constitute cruel and unusual punishment), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969); *Simborski* v. *Wheeler*, 121 Conn. 195, 197–98, 201, 183 A. 688 (1936) (challenge to form of execution was based on statutory rather than constitutional ground). Although the state suggests that the United States Supreme Court vacated *Davis* on other grounds, in truth, it was precisely this court's determination that legislative authorization insulated the death penalty from constitutional review that the Supreme Court rejected, in light of its decision in *Furman* v. *Georgia*, 408 U.S. 238, 239–40, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

[4] The portions of Holdsworth's dissertation suggesting that early criminal statutes were enacted in response to concerns over the abuse of magisterial discretion primarily refer to the prevalence of such concerns in *Massachusetts*. See W. Holdsworth, supra, pp. 104, 109, 167–71. The state fails to acknowledge that Holdsworth repeatedly emphasizes that such concerns were less pronounced in the Connecticut and New Haven colonies and that, in fact, those colonies continued to *increase* the authority and discretion of the magistrates after the adoption of Ludlow's Code. See id., pp. 104, 132, 137, 152–53, 171–72. As Holdsworth concludes, "[Ludlow] omitted most of the Bay Colony's liberties and permitted the magistrates greater discretion in dealing with many crimes. At one time, Connecticut's leaders were distrustful of magisterial discretion, but they became less anxious about it once they assumed the mantle of authority themselves, trusting themselves to deal sternly but justly with the multitude of problems that beset their commonwealth." Id., pp. 171–72; but see J. Trumbull, Historical Notes on the Constitutions of Connecticut, 1639–1818 (1901) pp. 9, 42 (noting that prominent founders of Connecticut, such as Thomas Hooker, founded colony to escape magisterial tyranny that they perceived in Massachusetts).

[5] Death Penalty Information Center, "States With and Without the Death Penalty," available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited May 12, 2016) (Maryland abolished death penalty in 2013, and Nebraska abolished death penalty in 2015).

[6] See Death Penalty Information Center, "Executions by Year," available at http://www.deathpenaltyinfo.org/executions-year (last visited May 12, 2016) (detailing number of executions in United States since 1976).

[7] *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

[8] See Death Penalty Information Center, "Death Sentences by Year: 1976–2014," available at http://www.deathpenaltyinfo.org/death-sentences-year-1977-2009 (last visited May 12, 2016); Death Penalty Information Center, "2015 Sentencing," available at http://www.deathpenaltyinfo.org/2015-sentencing (last visited May 12, 2016).

[9] See generally Death Penalty Information Center, "The Death Penalty in 2015: Year End Report," available at http://www.deathpenaltyinfo.org/documents/2015YrEnd.pdf (last visited May 12, 2016).

[10] See J. Donohue, Capital Punishment in Connecticut, 1973–2007: A Comprehensive Evaluation from 4686 Murders to One Execution (2011) pp. 131–46, available at http://www.deathpenaltyinfo.org/documents/DonohueCTStudy.pdf (last visited May 12, 2016) (finding little relationship between egregiousness and rate at which cases are charged as capital felonies, and noting that, of seventeen offenders potentially chargeable with capital felony murder for hire, only thirteen were charged capitally and only one—Santiago—was sentenced to death).

[11] Nor did we conclude in *Santiago* that Connecticut's prosecutors have exercised their discretion with anything less than complete professionalism. In *Santiago*, we opined only that, in light of the constraints imposed by federal law, it is virtually impossible to exercise such discretion so as to ensure that the imposition of the death penalty, writ large, will not be arbitrary and capricious.

[12] See, e.g., *Johnson* v. *Texas*, 509 U.S. 350, 361, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993); see also *Walton* v. *Arizona*, 497 U.S. 639, 663, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Scalia, J., concurring in part and concurring in the judgment) (opining that state cannot preclude consideration of defendant's racial beliefs as mitigating evidence), overruled in part on other grounds by *Ring* v. *Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

[13] See, e.g., Division of Criminal Justice, State of Connecticut, "Cold Cases—Open," available at http://www.ct.gov/csao/cwp/view.asp?a=1798&q=291462 (last visited May 12, 2016).

[14] See *State* v. *Roszkowski*, Superior Court, judicial district of Fairfield, Docket No. FBT-CR-06-0218479-T.

[15] See *State* v. *Howell*, Superior Court, judicial district of New Britain, Docket No. HHB-CR-15-0279874-T.

[16] For the same reasons, the state's argument that our decision in *Santiago* was precluded by Connecticut's savings statutes, General Statutes §§ 1-1 (t) and 54-194, also misses the mark.

[17] The state notes in its brief that maintaining the death penalty could serve a retributive purpose by "providing a sense of restoration and closure to victims and their families . . . ."

[18] The state, which quotes from the Book of Ecclesiastes in its brief, would do well to consider the following passage therefrom: "Better not vow at all than vow and fail to pay." Ecclesiastes 5:5, in The New English Bible: Old Testament (Oxford University Press & Cambridge University Press 1970) p. 931.

[19] We relied on *Anderson* for the proposition that "incidental references to the death penalty in a state constitution merely acknowledge that the penalty was in use at the time of drafting; they do not forever enshrine the death penalty's constitutional status as standards of decency continue to evolve . . . ." *State* v. *Santiago*, supra, 318 Conn. 131.

[20] Justice Espinosa, in her dissenting opinion in the present case, repeatedly suggests that *Santiago* is not binding precedent because it was decided on the basis of the subjective moral beliefs of the majority, contrary to precedent and in violation of our sworn duty to follow the law. We already have said everything that needs to be said with respect to these baseless assertions. See *State* v. *Santiago*, supra, 318 Conn. 86 n.89. With respect to the issue of stare decisis, we merely reiterate that our decision in *Santiago* did not overturn controlling precedent but, rather, applied the well established evolving standards of decency test in the context of a fundamentally new and different legal landscape, in which capital punishment has been legislatively abolished—an issue of first impression never before addressed by this or any other court prior to the adoption of P.A. 12-5. Justice Espinosa's reliance on *Adarand Constructors*, *Inc.* v. *Pena*, 515 U.S. 200, 234, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995), therefore, is misplaced.

[21] Whether capital punishment might be reinstated in Connecticut by means other than a constitutional amendment is not before us in this case. See *State* v. *Santiago*, supra, 318 Conn. 86 n.88.

[22] I take no position on the question of whether, following our decision in *Santiago*, this court has the power to reauthorize the death penalty without new enabling legislation. Compare *Jawish* v. *Morlet*, 86 A.2d 96, 97 (D.C. 1952) (statute held to be unconstitutional is "not void in the sense that it is repealed or abolished" but remains dormant, and may be revived by subsequent judicial decision), with *Dascola* v. *Ann Arbor*, 22 F. Supp. 3d 736, 744–46 (E.D. Mich. 2014) (decision holding statute unconstitutional essentially nullifies statute, and if court should later determine that it does in fact pass constitutional muster, legislature must reenact it).